# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| CHRISTINE MIDNIGHT, | * |
| | * |
| | *    No. 17-905V |
| | *    Special Master Christian J. Moran |
| Petitioner, | * |
| | * |
| v. | * |
| | *    Filed: June 29, 2022 |
| SECRETARY OF HEALTH | * |
| AND HUMAN SERVICES, | *    Attorneys' fees and costs, |
| | *    reasonable basis |
| Respondent. | * |

* * * * * * * * * * * * * * * * * * * * * * * *

Mark T. Sadaka, Law Offices of Sadaka Associates, LLC, Englewood, NJ, for petitioner;
Claudia B. Gangi, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION AWARDING ATTORNEYS' FEES AND COSTS[1]

     Christine Midnight sought compensation through the Vaccine Program, 42 U.S.C. § 300aa-10 through 34 (2012), but her case was dismissed. 2021 WL 6426427 (Fed Cl. Spec. Mstr. Nov. 23, 2021). Ms. Midnight has sought an award of attorneys' fees and costs that the Secretary opposes because Ms. Midnight has not established that reasonable basis supported the claim set forth in the petition.

     However, a review of the evidence shows that Ms. Midnight has satisfied the relatively low threshold for reasonable basis. As such, she is eligible for an award

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website. This posting will make the decision available to anyone with the internet. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

of attorneys' fees and costs.  A reasonable amount of these fees and costs totals **$46,225.30**.

I.    **Background**

    A.    **Medical Chronology**

Before receiving the vaccines at issue, Ms. Midnight suffered from various problems, including mental health problems.  See, e.g., exhibit 3 at 20-30, exhibit 4 at 40-47.  Some of those problems also occurred after the vaccinations, but Ms. Midnight alleges she experienced new problems after the vaccinations.  Thus, for sake of simplicity, the problems that are arguably the same before and after vaccination are not discussed in this decision.

Ms. Midnight received the first set of relevant vaccines on July 9, 2014.  This set included the mumps-measles-rubella ("MMR") vaccine, tetanus-diphtheria-acellular pertussis ("Tdap") vaccine, and the varicella vaccine.  Exhibit 5 at 1.

About one month later, Ms. Midnight saw a psychiatrist with whom she had a standing relationship, Robert Franklin.  Dr. Franklin noted that Ms. Midnight was complaining about increased anxiety due to a new job as a nurse contractor.  Exhibit 3 at 19 (Aug. 7, 2014).

On that same day, August 7, 2014, Ms. Midnight also had an appointment with her primary care physician, Brian White.  Dr. White diagnosed Ms. Midnight as suffering from chronic pain, likely fibromyalgia.  Exhibit 4 at 29-30.

Ms. Midnight received the second set of relevant vaccines on August 15, 2014.  This set included repeat doses of the MMR and varicella vaccines.  Exhibit 5 at 1.  Although Ms. Midnight's claim is not entirely clear, it appears that she focuses her arguments on the August 15, 2014 vaccinations.

Ms. Midnight sought medical care from Concerta Urgent Care on August 26, 2014.  She complained about a fever for one month and a "very strong headache."  Exhibit 11 at 8.  Ms. Midnight also reported that she "always has [a] reaction to vaccines."  Id.  Her physical exam was normal.  Id. at 2-3.  She was referred to an emergency room for further work up.  Id. at 4, 7.  According to Ms. Midnight's

attorney, the referral indicates that the staff at the urgent care center could not handle her complaints.  Tr. from Oral Arg. on May 17, 2022 ("Tr.") 4.

Ms. Midnight went to the Sandoval Regional Medical Center, which is associated with the University of New Mexico.  As at urgent care, Ms. Midnight reported low-grade fevers since her immunizations at the beginning of the month and a high fever of 102 degrees the previous night.  Exhibit 24 at 32.  She also had a headache, which she seems to have rated as a 3 out of 10.  Id. at 25, 32.  Both legs were tender on palpation, id. at 31, and Ms. Midnight described her leg problems as new.  Exhibit 24 at 20.  During this visit, Ms. Midnight said that "her heart is 'flip flopping' in her chest."  Id. at 10.  Her blood pressure was high.  Id. at 31-32.  After an examination, Ms. Midnight was discharged with a diagnosis of hypertension and advised to consult her doctor.  Id. at 29.

Ms. Midnight returned to her doctor, Dr. White, on September 5, 2014.  She told Dr. White that "shortly after receiving recent immunizations," she had a new headache and fever.  Exhibit 4 at 24-26.  Ms. Midnight also said that she had not had a fever for the "last few days" and her headache "improved significantly about 3 or 4 days ago."  Id. at 26.  In Dr. White's assessment and plan, he stated that Ms. Midnight's "symptoms . . . seem fairly characteristic for many viral illnesses, including mild encephalitis."  Id. at 27.  He added that Ms. Midnight's acute illness "seems fairly unlikely to be a vaccine reaction."  Id.

Dr. White's September 5, 2014 report, as discussed below, is a primary aspect of the disagreement between the parties regarding reasonable basis.  Ms. Midnight points to Dr. White's diagnosis of "encephalitis."  Contrastingly, the Secretary emphasizes Dr. White's determination that a vaccine reaction was "fairly unlikely."

Ms. Midnight's medical chronology continues on September 16, 2014, when she saw her psychiatrist, Dr. Franklin, for an "emergency meeting."  Exhibit 3 at 18.  Ms. Midnight informed Dr. Franklin that she had been diagnosed with "Guillain Barré + encephalitis."  Id.  The reference to "Guillain Barré" appears to be a mistake as no medical record substantiates that diagnosis.  Ms. Midnight more accurately also informed Dr. Franklin that she experienced "bad [headaches] + fever" for two months.  Id.  Her current symptoms included "irritable," "forgetful – getting a little better," and "confusion."  Id.  Dr. Franklin recommended that Ms. Midnight restart valium and continue other medications.  Id.

3

Approximately six weeks later, Ms. Midnight had another appointment with Dr. White.  The history of present illness states that she experienced "tingling in fingers, headaches, [and] weakness" and she was "diagnosed with possible encephalitis."  Exhibit 3 at 23.  On examination, Dr. White detected a slightly diminished ability to detect sensations distally.  Id.  Dr. White recommended an evaluation by a neurologist to see if any causes for her problems could be determined.  Id. at 24.

The visit with the neurologist, Douglas Barrett, took place on January 2, 2015.  Exhibit 6.  Dr. Barrett obtained a detailed account of Ms. Midnight's headaches.  According to this history, Ms. Midnight "was in her usual state of health until early July when she received some vaccinations."  Exhibit 6 at 6.  The neurologic examination was normal.  Id. at 7.  Because of the normal neurologic exam, Dr. Barrett did not order any neurodiagnostic imaging or any testing on her cerebrospinal fluid.  Id. at 8.  Dr. Barrett's impression was that Ms. Midnight had "a reaction to her vaccinations that produced, based on her history alone, a sterile meningitis with a component of encephalitis."  Id. at 7.

The parties place different emphasis on this report from Dr. Barrett.  Ms. Midnight argues that he said that she had a reaction to her vaccinations.  But, the Secretary maintains that this conclusion merits little weight because it is based upon a history from Ms. Midnight alone.

Dr. Barrett sent his evaluation to Dr. White, who reviewed it in conjunction with an appointment on February 18, 2015.  Ms. Midnight told Dr. White that she was having headaches and some difficulty retrieving words.  Exhibit 4 at 20.  In the assessment / plan, Dr. White, after mentioning Dr. Barrett's note, stated that Ms. Midnight likely has sterile meningoencephalitis, "probably vaccine related, suspect measles."  Id.

Following this February 18, 2015 visit with Dr. White, the parties have not emphasized any medical records until a March 15, 2017 appointment with Dr. Barrett.  In that visit, Ms. Midnight told Dr. Barrett that she has had persistent headaches and the nature of her headaches has changed.  Exhibit 6 at 3.  In addition to assessing Ms. Midnight with headaches, Dr. Barrett stated she had a "mild cognitive impairment."  Id. at 4.  He indicated: "She is continuing to experience cognitive complaints unchanged from her prior exam as well as worsening problems of depression.  This is not the usual natural history of a presumed post [vaccinal] meningoencephalitis and the possibility of alternative problems, e.g. nonconvulsive seizures will be considered."  Id.

4

### B.    Procedural History

Dr. Barrett's March 15, 2017 evaluation occurred about three months before the litigation began.  Represented by attorney Mark Sadaka, Ms. Midnight alleged that the MMR, Tdap, and varicella vaccines she received on July 9, 2014, and the second set of MMR and varicella vaccines she received on August 15, 2014, caused her to develop encephalitis, speech-regression, blurred vision, and reduced cognitive ability.  See Pet., filed July 5, 2017, at Preamble; ¶¶ 2, 13.  Ms. Midnight alleged that after her second set of vaccinations, she developed headaches, fevers, and pain in her arms and legs.  Id. ¶ 3.  Ms. Midnight filed initial medical records in July 2017, August 2017, and September 2017.  She filed a statement of completion on September 27, 2017, and a damages affidavit on October 16, 2017.  Subsequently, she filed more medical records in April 2018, May 2018, June 2018, and April 2020.

The Secretary recommended against compensation, questioning Ms. Midnight's encephalitis diagnosis and asserting that Ms. Midnight's headaches, speech regression, and reduced cognitive ability predated vaccination.  Resp't's Rep., filed July 26, 2018, at 11-12.  Ms. Midnight was ordered to file expert reports from a neurologist and neuroradiologist clearly identifying the injury Ms. Midnight allegedly suffered as a result of vaccination and her medical theory of causation.  See order, filed Aug. 6, 2018.

Ms. Midnight was given multiple opportunities to obtain the report from an expert.  Because these details are not relevant to the evaluation of the motion for attorneys' fees and costs, they are not set forth here.  However, they are found in the Decision Denying Entitlement, issued November 23, 2021.  Ms. Midnight's case was eventually dismissed because she appeared not interested in maintaining her case.

While Ms. Midnight's claim for compensation was pending, she submitted a motion for an award of attorneys' fees and costs on an interim basis.  Pet'r's Initial Mot., filed June 22, 2020.  Ms. Midnight subsequently renewed her motion to seek final fees.  Pet'r's Renewed Mot., filed Nov. 30, 2021.  The Secretary opposed Ms. Midnight's eligibility for attorneys' fees and costs.  See Resp't's Resp., filed Dec. 13, 2021.  An oral argument was held on May 17, 2022.  This argument helped clarify the parties' positions regarding reasonable basis.

II.   **Eligibility for Attorneys' Fees and Costs**

A.   **Standards for Adjudication**

Petitioners who have not been awarded compensation (like Ms. Midnight here) are eligible for an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim." 42 U.S.C. § 300aa-15(e)(1). As the Federal Circuit has stated, "good faith" and "reasonable basis" are two separate elements that must be met for a petitioner to be eligible for attorneys' fees and costs. Simmons v. Sec'y of Health & Hum. Servs., 875 F.3d 632, 635 (Fed. Cir. 2017). Here, the Secretary has not raised a challenge to Ms. Midnight's good faith. Thus, the disputed issue is reasonable basis.

In Cottingham v. Secretary of Health & Human Services, the Federal Circuit stated that the evidentiary burden for meeting the reasonable basis standard "is lower than the preponderant evidence standard." 971 F.3d 1337, 1346 (Fed. Cir. 2020). Something "more than a mere scintilla" might establish the reasonable basis standard. Id. at 1346. Petitioners meet their evidentiary burden with "objective evidence." Id. at 1344. In categorizing medical records as objective evidence, the Federal Circuit stated, "[m]edical records can support causation even where the records provide only circumstantial evidence of causation." Id. at 1346. Finally, the Federal Circuit in Cottingham specified that "we make no determination on the weight of the objective evidence in the record or whether that evidence establishes reasonable basis, for these are factual findings for the Special Master and not this court." Id. at 1347.

In its most recent opinion regarding the reasonable basis standard, the Federal Circuit stated that medical records, affidavits, and sworn testimony all constitute objective evidence to support reasonable basis. James-Cornelius v. Sec'y of Health & Hum. Servs., 984 F.3d 1374, 1379-81. The Federal Circuit further clarified that "absence of an express medical opinion on causation is not necessarily dispositive of whether a claim has reasonable basis, especially when the case is in its early stages and counsel may not have had the opportunity to retain qualified experts." Id. at 1379 (citing Cottingham, 971 F.3d at 1346). These two most recent decisions guide the analysis regarding what types of evidence constitute objective evidence of reasonable basis, as originally articulated in Simmons, though the ultimate weighing of such evidence is left up to the special master.

6

**B.     Evaluation of the Evidence**

In simple terms, the parties differ in how they value the records Ms. Midnight's treating doctors created.  Ms. Midnight tends to accept various statements on their face.  For example, Ms. Midnight cites Dr. Barrett's diagnosis of "meningoencephalitis" as a "reaction to her vaccination[s]."  Pet'r's Reply, filed Dec. 20, 2021, at pdf 4-5 (citing exhibit 6 at 7).  The Secretary, in contrast, examines these statements at a deeper level.  For example, the Secretary maintains Dr. Barrett's diagnosis should carry minimal weight because Dr. Barrett made his conclusion "based on [Ms. Midnight's] history alone."  Resp't's Resp., filed Dec. 13, 2021, at 7 (quoting exhibit 6 at 7).

One judge of the Court of Federal Claims provided some guidance about the level of scrutiny to give to statements of treating doctors when determining whether reasonable basis supports the claims set forth in the petition in Wirtshafter v. Secretary of Health & Human Services, 155 Fed. Cl. 665 (2021).  In that case, the (undersigned) special master had reviewed statements from treating physicians and had declined to credit them because, in part, the treating doctors received inaccurate information.  Wirtshafter, No. 18-1562V, 2021 WL 1906258, at *7 (Fed. Cl. Spec. Mstr. Apr. 16, 2021).  However, after a motion for review was filed, the Court held, as a matter of law, that the special master's evaluation constituted an abuse of discretion.  155 Fed. Cl. at 672.  In the Court's view, the finding of "inaccurate information" was not accurate despite the presence of "conflicting information."  Id. at 673.  Thus, based upon the statements of treating doctors who suspected that Ms. Wirtshafter's neurologic problem was triggered by a vaccination, the Court found that the evidence in that case satisfied the reasonable basis standard.  Id. at 675.

Wirtshafter was raised with the parties during the May 17, 2022 oral argument.  See order, issued May 12, 2022.  The Secretary's response was, essentially, three-fold.  First, the Secretary stated that as an opinion from the Court of Federal Claims that is not a remand, Wirtshafter does not establish precedent that binds the outcome in this case.  Tr. 22.  On this point, the Secretary is technically correct.  See Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1358 (Fed. Cir. 2019); Hanlon v. Sec'y of Health & Hum. Servs., 40 Fed. Cl. 625, 630 (1998), aff'd in non-relevant part, 191 F.3d 1344 (Fed. Cir. 1999).  However, the Secretary fails to appreciate that Wirtshafter constitutes a persuasive precedent from a tribunal that oversees decisions of special masters.  It, therefore, remains relevant based upon its power to persuade.

7

Wirtshafter's (lack of) persuasiveness is the Secretary's second point.  The Secretary maintained that the Court's opinion constituted bad law because it was not consistent with the Federal Circuit's opinion in Perreira v. Sec'y of Health & Hum. Servs., 33 F.3d 1375 (Fed. Cir. 1994).  Tr. 28.  However, the Secretary could have challenged the outcome of Wirtshafter by appealing to the Federal Circuit.  The Secretary's failure to file an appeal, although not dispositive, certainly induces some hesitancy for the undersigned to question the outcome of Wirtshafter.

As a third and final point, the Secretary attempted to distinguish Wirtshafter by arguing that the evidence from treating doctors in Wirtshafter was, in some ways, stronger than the evidence from Ms. Midnight's treating doctors.  Tr. 24-25.  However, a lesson from Wirtshafter is that statements from treating doctors, at least those statements that are rendered in the course of treatment, should not be examined very critically in determining whether a reasonable basis supports the claim set forth in the petition.

Here, Ms. Midnight's July 5, 2017 petition alleged the MMR and varicella vaccines she received on August 15, 2014 caused her to develop encephalitis.  See Pet. at Preamble; ¶¶ 2, 13.  Dr. Barrett's January 2, 2015 report and Dr. White's February 8, 2015 report indicate that Ms. Midnight had meningoencephalitis due to the vaccinations.  Exhibit 6 at 7; exhibit 4 at 20.  These reports, taken together, constitute more than a scintilla of evidence supporting a claim set forth in the petition.

A judge of the Court of Federal Claims has recognized that even when a petitioner produces more than a scintilla of evidence, a special master may find that the petitioner, nevertheless, failed to meet the threshold for establishing reasonable basis.  Cottingham v. Sec'y of Health & Hum. Servs., 159 Fed. Cl. 328 (2022), appeal docketed, No. 22-1737 (Fed. Cir. Apr. 28, 2022).  Such is not the case here.  "[D]espite the enigma that surrounds the amount and quality of evidence necessary to establish a reasonable basis for a vaccine compensation claim," Wirtshafter, 155 Fed. Cl. at 672, Ms. Midnight's evidence crosses the line.  She has met her burden to establish that her claim was supported by reasonable basis and, therefore, she is eligible for an award of attorneys' fees and costs.  42 U.S.C. § 300aa-15(e).

Technically, being eligible for an award of attorneys' fees and costs does not necessarily entitle a petitioner to an award of attorneys' fees and costs.  Because the Vaccine Act states that a special master "may" (not "shall") award attorneys' fees and costs to eligible petitioners, special masters retain some discretion not to

award attorneys' fees and costs.  See Wirtshafter, 155 Fed. Cl. at 675-76.  But, the Secretary has not identified any ground to deny attorneys' fees and costs.  See Tr. 30-31.  Accordingly, the undersigned finds an award of attorneys' fees and costs appropriate.

## III.   Reasonable Amount of Attorneys' Fees and Costs

The Vaccine Act permits an award of reasonable attorneys' fees and costs. 42 U.S.C. § 300aa-15(e).  The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act.  This is a two-step process.  Avera v. Sec'y of Health & Hum. Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008).  First, a court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'"  Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings.  Id. at 1348.  Here, because the lodestar process yields a reasonable result, no additional adjustments are required.  Instead, the analysis focuses on the elements of the lodestar formula, a reasonable hourly rate and a reasonable number of hours.

### A.   Reasonable Hourly Rates

Under the Vaccine Act, special masters, in general, should use the forum (District of Columbia) rate in the lodestar calculation.  Avera, 515 F.3d at 1349. However, when the bulk of the work is done outside the District of Columbia and the attorneys' rates are substantially lower, the Davis County exception applies, and petitioner's counsel is paid according to the local rate.  Id. at 1349 (citing Davis Cty. Solid Waste Mgmt. and Energy Recovery Special Serv. Dist. v. U.S. Env't Prot. Agency, 169 F.3d 755, 758 (D.C. Cir. 1999)).  In this case, all the attorneys' work was done in New Jersey.  The local rate is substantially similar to the forum rate.  Therefore, the Davis County exception does not apply.

Ms. Midnight requests the following hourly rates for the work of her counsel, Mr. Sadaka: $362.95 per hour for work performed in 2016; $376.78 per hour for work performed in 2017; $396.00 per hour for work performed in 2018; $405.00 per hour for work performed in 2019; $422.00 per hour for work performed in 2020; and $440.00 per hour for work performed in 2021.  Pet'r's Initial Mot. at 5; Pet'r's Renewed Mot. at 5.  These rates are consistent with what Mr. Sadaka has previously been awarded for his Vaccine Program work.  See, e.g., Dew v. Sec'y of Health & Hum. Servs., No. 16-1238V, 2019 WL 2317303, at *2

9

(Fed. Cl. Spec. Mstr. Apr. 30, 2019); Miller v. Sec'y of Health & Hum. Servs., No. 18-587V, 2021 WL 3674659, at *3 (Fed. Cl. Spec. Mstr. July 20, 2021).  Petitioner also requests reasonable hourly rates for work performed by the firm's paralegal.  Accordingly, the requested hourly rates are reasonable.

### B.    Reasonable Number of Hours

The second factor in the lodestar formula is a reasonable number of hours.  Reasonable hours are not excessive, redundant, or otherwise unnecessary.  See Saxton, 3 F.3d at 1521.  The Secretary did not directly challenge any of the requested hours as unreasonable.

The undersigned has reviewed the submitted billing records and finds the time billed to be reasonable.  The timesheets provide sufficiently detailed descriptions of the work performed.  See fee exhibits A (requesting $38,576.90) and C (requesting $4,942.70).

Mr. Sadaka submitted his invoices before the oral argument.  Mr. Sadaka was prepared and advocated persuasively.  The undersigned will award an additional $1,500 for Mr. Sadaka's work.

Accordingly, a reasonable amount of attorneys' fees and costs is **$45,019.60**.

### C.    Costs

Like attorneys' fees, a request for reimbursement of costs must be reasonable.  Perreira v. Sec'y of Health & Hum. Servs., 27 Fed. Cl. 29, 34 (1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994).  Petitioner requests a total of $3,205.70 in attorneys' costs.  This amount is comprised of acquiring medical records, postage, the Court's filing fee, and expert fees for Dr. Kinsbourne.  The bulk of the costs represent fees incurred by counsel in attempting to secure an expert opinion by Dr. Kinsbourne.  See fee exhibit B.

The costs associated with Dr. Kinsbourne are not reasonable.  Preliminarily, the undersigned has commented that Dr. Kinsbourne's usefulness as an expert has declined because he has not practiced neurology in decades and the quality of his opinions has slipped.  See, e.g., Ellis v. Sec'y of Health & Hum. Servs., No. 13-336V, 2019 WL 3315326, at *9 (Fed. Cl. Spec. Mstr. June 24, 2019); Hoskins v. Sec'y of Health & Hum. Servs., No. 15-071V, 2017 WL 3379270, at *5 (Fed. Cl. Spec. Mstr. July 12, 2017) ("[A]ttorneys representing petitioners are placed on

10

notice that compensation for Dr. Kinsbourne should not be assumed automatically.").

More importantly, Ms. Midnight has not evidenced a justification for his work. Dr. Kinsbourne's invoice is a single line, noting he received a retainer of $2,000. Fee exhibit B at pdf 19. A retainer does not evidence the work Dr. Kinsbourne performed. See Guidelines for Practice Under the National Vaccine Injury Compensation Program, Section X. Chapter 3. ¶ A ("With regard to attorneys' fees and experts' fees, the particular tasks for which fees are claimed, the amount of time spent on that task, the person who performed the task, and that person's billed hourly rate must be identified in contemporaneous, dated records."); see also Dahl v. Sec'y of Health & Hum. Servs., No. 13-98V, 2018 WL 6818741, at *8 (Fed. Cl. Spec. Mstr. Nov. 30, 2018). Without some information from Dr. Kinsbourne, the undersigned cannot evaluate whether his proposed hourly rate is reasonable and cannot determine whether the number of hours he spent is reasonable. Accordingly, due to the deficiency in the submission regarding Dr. Kinsbourne's work, this requested item cannot be allowed.

For the remainder of the costs, Ms. Midnight has provided adequate documentation supporting all of the requested costs, and all appear reasonable in the undersigned's experience. Ms. Midnight is therefore awarded $1,205.70 in costs.

## IV.   Conclusion

The Vaccine Act permits an award of reasonable attorney's fees and costs. 42 U.S.C. § 300aa-15(e). Accordingly, I award a total of **$46,225.30** (representing $45,019.60 in attorneys' fees and $1,205.70 in attorneys' costs) as a lump sum in the form of a check jointly payable to Ms. Midnight and Ms. Midnight's counsel, Mr. Mark Sadaka. In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[2]

---

[2] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master
